UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No.
08-10094-WGY

UNITED STATES OF AMERICA

v.

ANTHONY J. D'AMORE

# MEMORANDUM AND ORDER ON
# GOVERNMENT'S MOTION FOR DETENTION

May 20, 2008

DEIN, M.J.

## I.  MOTION RELATING TO DETENTION

The defendant is charged in a one-count indictment with conspiracy to commit

bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 371.

An initial appearance was held on May 2, 2008 before Magistrate Judge Alexander, at

which time the defendant was represented by counsel.  A detention hearing was

scheduled before this court for May 7, 2008 and continued to May 13, 2008 by agree-

ment.  The defendant was represented by counsel.  The government has moved for

detention pursuant to 18 U.S.C. § 3142(f)(1)(D) as the defendant has been convicted of

two prior qualifying drug felonies, and contends that detention is warranted as the

defendant poses a danger to the community and a serious risk of flight.  The govern-

ment has also moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(B) on the

grounds that there is "a serious risk" that the defendant "will obstruct or attempt to

obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."

At the detention hearing on May 13, 2008, the government presented the testimony of Special Agent Michael Kelly of the FBI and introduced various exhibits. The defendant cross-examined Agent Kelly but did not present any witnesses.

After a careful review of the evidence presented, and consideration of the arguments of counsel, this court finds that the government has not met its burden of proving by clear and convincing evidence either that there are no conditions which can be set which will reasonably assure the safety of witnesses or the community, or that the defendant will obstruct or attempt to obstruct justice as defined by § 3142(f)(2)(B). In addition, this court finds that the government has not met its burden of proving by a preponderance of the evidence that the defendant poses a serious risk of flight. Therefore, the defendant shall be ordered released subject to the conditions set forth below.

## II.  THE BAIL REFORM ACT

A.      Under the provisions of 18 U.S.C. § 3142 ("The Bail Reform Act"), the judicial officer shall order that, pending trial, the defendant either be (1) released on his or her own recognizance or upon execution of an unsecured bond; (2) released on a condition or combination of conditions; (3) temporarily detained to permit revocation of conditional release, deportation or exclusion; or (4) detained.  See 18 U.S.C. § 3142(a).

Under § 3142(e), a defendant may be ordered detained pending trial if the judicial officer finds by clear and convincing evidence after a detention hearing "that no

condition or combination of conditions (set forth under § 3142(b) or (c)) will reasonably assure the safety of any other person or the community . . . ," or if the judicial officer finds by a preponderance of the evidence after a detention hearing "that no condition or combination of conditions will reasonably assure the appearance of the person as required . . . ."  See United States v. Patriarca, 948 F.2d 789, 792-93 (1st Cir. 1991).

       B.     The government is entitled to move for detention on grounds of danger to the community in a case that –

       (1)     involves a crime of violence within the meaning of 18 U.S.C. § 3156(a)(4) or a federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)(5) for which a maximum term of imprisonment of 10 years or more is prescribed;

       (2)     involves an offense punishable by death or life imprisonment;

       (3)     involves an offense proscribed by the Controlled Substances Act or the Controlled Substances Import and Export Act for which the punishment authorized is imprisonment for ten years[1] or more;

       (4)     involves any felony alleged to have been committed after the defendant has been convicted of two or more crimes of violence, or of a crime, the punishment for which is death or life imprisonment, or a ten year [or more] offense under the Controlled Substances Act or the Controlled Substances Import and Export Act; or

---

[1]   The maximum penalty is that provided by the statute defining and/or providing the punishment for the substantive offense – not the sentence, or even the maximum sentence, which might otherwise be imposed under the federal Sentencing Guidelines.  See United States v. Moss, 887 F.2d 333, 336-37 (1st Cir. 1989).

(5)     involves any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device, as defined in 18 U.S.C. § 921, or any other dangerous weapon, or involves a failure to register as a sex offender under 18 U.S.C. § 2250.  See 18 U.S.C. § 3142(f)(1).

Additionally, the government or the court sua sponte may move for, or set, a detention hearing where there is a serious risk that the defendant will flee, or where there is a serious risk of obstruction of justice or threats to potential witnesses.  See 18 U.S.C. § 3142(f).

C.     In determining whether there are conditions of release which will reasonably assure the appearance of the person as required and the safety of any other person and the community, or whether pretrial detention is warranted, the judicial officer must take into account and weigh information concerning --

(1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive or destructive device;

(2)     the weight of the evidence against the accused;

(3)     the history and characteristics of the person, including --

(a)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(b)     whether, at the time of the current offense or arrest, the defendant was on probation, on parole, or other release

pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state or local law; and

(4)     the nature and seriousness of the danger to any other person or the community that would be posed by the person's release.

<u>See</u> 18 U.S.C. § 3142(g).

D.     Additionally, in making the determination, the judicial officer must consider two rebuttable presumptions, to wit:

<u>First</u>, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person or the community if the judicial officer finds (1) that the defendant has been convicted of a felony within the class of offenses described in 18 U.S.C. § 3142(f)(1) as detailed above, or of a state or local offense that would have been an offense described in § 3142(f)(1) if a circumstance giving rise to federal jurisdiction had existed; (2) that prior offense was committed while the person was on release pending trial for another local, state or federal offense; and (3) not more than five years has elapsed since the date of conviction for that prior offense, or his or her release for that prior offense, whichever is later.  <u>See</u> 18 U.S.C. § 3142(e).  The government contends that this rebuttable presumption applies in the instant case.  However, since more than five years has elapsed since the defendant was released from prison, this court concludes that this rebuttable presumption does not apply.

<u>Second</u>, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to

believe that the person has committed an offense for which a maximum term of

imprisonment of ten years or more is prescribed by the Controlled Substances Act or

the Controlled Substances Import and Export Act or an offense under the provisions of

18 U.S.C. § 924(c) (use of or carrying a firearm during the commission of a federal

offense which is a felony), 18 U.S.C. § 956(a) (conspiracy to kill, kidnap, maim, or

injure persons or damage property in a foreign country), or 18 U.S.C. § 2332b (acts of

terrorism transcending national boundaries); or is a federal crime of terrorism as

defined in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10

years or more is prescribed; or is an offense involving a minor victim.  See 18 U.S.C.

§ 3142(e).  The parties agree that this rebuttable presumption has no application in the

instant case.

### III.   DISCUSSION OF WHETHER DETENTION IS WARRANTED

"Detention determinations must be made individually and, in the final analysis,

must be based on the evidence which is before the court regarding the particular

defendant."  U.S. v. Tortora, 922 F.2d 880, 888 (1st Cir. 1990), and cases cited.  In the

instant case, this court finds that the government has failed to meet its burden of

proving that detention is appropriate.

### A.   The Offense Charged And Weight Of The Evidence

The defendant is charged with conspiracy to commit bribery, and the evidence

against him appears strong.  Most of the meetings and conversations upon which the

charges are based apparently were the subject of audio and/or video recordings.  This

court notes, however, that the crime as charged does not involve violence or threats of violence.

Briefly, the evidence before this court is that in or about May 2006, a cooperating witness ("CW-1") informed the FBI that defendant Carmen DiNunzio had contacted him and told CW-1 that he would be contacted by a third person about selling stolen loam to the Big Dig.  After this phone call from DiNunzio, CW-1 was, in fact, contacted by D'Amore.  Neither of these communications were recorded.  CW-1 was known to DiNunzio before this transaction.  DiNunzio introduced CW-1 to D'Amore.

The idea of selling stolen loam fell to the wayside.  However, according to the government, the scheme to bribe a highway department employee to obtain the loam contract, and then to deliver less than the contracted for amount of loam continued to be planned.  It appears that the bribery scheme was originally developed by the FBI, who conveyed it to the defendants through CW-1.  Apart from a $15,000 down payment to the alleged highway department employee, the scheme was never consummated. As the government described the scheme in Agent Kelly's affidavit:

> In summary, during these various recorded meetings DiNunzio, D'Amore and CW-1 discussed a deal in which they would bribe a Massachusetts Highway inspector, introduced to them by CW-1 as "Mike", to ensure that they received the contract to supply the Big Dig with 300,000 cubic yards of loam that would be supplied by D'Amore's contact, Andrew Marino.  The individual the parties knew as "Mike" was, in fact, an undercover law enforcement officer (hereinafter the "UC" or Mike").  The proposed loam contract would be worth $6,000,000 (i.e., the Big Dig would pay $20 per yard of loam, including trucking and delivery costs to be billed by a

company with which Marino was associated, "Company A", that would supply the loam).

During consensually recorded conversations throughout the summer and fall of 2006, DiNunzio, D'Amore, and Marino agreed to pay "Mike", who they believed was a Massachusetts Highway inspector, a cash down payment and 5% of the revenue from the contract in exchange for "Mike"'s assurance that they would get the contract to sell 300,000 yards of loam to the Big Dig.

During a consensually recorded meeting on September 22, 2006, DiNunzio provided $10,000 in cash to CW-1 for the purpose of facilitating the down payment of the payoff to "Mike".  On September 29, 2006, Marino, D'Amore, and CW-1 met with "Mike" (i.e., the UC) at Company A and provided "Mike" with the $10,000 in cash supplied by DiNunzio, as well as an additional $5,000 in official government funds ostensibly supplied by CW-1, as a down payment for "Mike"'s assistance in ensuring that they secure the contract to sell the Massachusetts Highway Department 300,000 yards of loam.  This meeting was consensually recorded on audio and video tape.  During the same recorded meeting on September 29, 2006, Marino provided "Mike" with a sample of the 300,000 yards of loam that they proposed to sell to the Massachusetts Highway Department.

Ex. 1 (Kelly Aff.) at ¶¶ 5-7.  Thus, according to the government, D'Amore reported to

DiNunzio, and brought defendant Marino into the deal.  For his part, Marino was to

supply the loam from Company A and transport it through his trucking company

("Company B"), and Marino was to bill for the loam and be paid by the Big Dig.  See id.

at ¶ 16.  Marino would then share the profits with the other participants in the scheme.

CW-1 was to supply the purported inside man at the Massachusetts Highway

Department (the UC) to insure that Marino got the loam contract and to make sure that

the loam was not subject to inspection.  According to the government,"DiNunzio,

because of his reputation as a high level member of the [New England La Cosa Nostra], brought to the loam deal the threat of force and financial credibility." Id.

By October 2006, there was some indication that Marino might back out of the arrangement since he was concerned that it was too risky because the participants wanted to shortchange the Big Dig a noticeable amount per truckload.  According to the government, there were a number of conversations pursuant to which it was eventually decided to short the Big Dig only 1 - 2 yards of loam per truck.  This, in turn, raised concerns among the participants that there would not be enough profits to split among them all.

DiNunzio was arrested in December 2006 on state charges of extortion, organizing and promoting an illegal gaming operation, and conspiracy to violate the gaming laws.  These charges arose out of activities which had allegedly taken place five years earlier, between September and December 4, 2001.  DiNunzio was released upon posting $20,000.00 bail.

The loam deal was never consummated.  No violence has been perpetrated against the UC, Marino or the CW-1 to date, nor is there any evidence that they have been threatened.

### B.  History And Characteristics Of The Defendant

The defendant, age 54, was born in Winthrop, Massachusetts, and is a lifelong resident of Massachusetts.  He has been married since 1981, although he and his wife have been separated since his arrest and incarceration in 1992.  The defendant has a son who is graduating high school and will be attending college in the fall, and a

daughter who is graduating from college this year.  D'Amore is an electrician by trade, and received a GED while incarcerated.  He is self-employed.

Since his release from prison in 2002, the defendant has been living in Revere in a two-family home owned by his mother.  He has a brother who is an attorney and a sister who is a paralegal, both living in Massachusetts.  D'Amore has a large, extended family, all living in Massachusetts.

The defendant is under a doctor's care for high blood pressure, high cholesterol, a reflex disorder and asthma.  He has used cocaine and painkillers in the past, but does not report a substance abuse problem.

The defendant has a serious criminal history.  In July 1991, he was indicted in federal court in Boston for failing to report the transportation of monetary instruments of more than $10,000.  The money was apparently found hidden in a car.  The defendant pled guilty and was sentenced to four months imprisonment to be followed by three years of supervised release.

In March 1992, while the first case was pending, five separate federal indict-ments were handed down in Boston.  These were for conspiracy to possess with intent to distribute cocaine, conspiracy to possess with intent to distribute marijuana, conspiracy to possess with intent to distribute 100 or more marijuana plants, conspiracy to import 100 kilograms or more of marijuana into the United States, and conspiracy to possess with intent to distribute cocaine.  Ex. 4.  The cases were consolidated. D'Amore pleaded guilty and, in March 1995, was sentenced to 108 months in prison to be followed by five years of supervised release.  This supervision commenced on

March 29, 2002 and ended on March 27, 2007.  Therefore, he was on supervised release at the time he allegedly committed the crime with which he is presently charged.  There is no other evidence of violation of conditions of supervised release.

According to the government, D'Amore is not a member of La Cosa Nostra ("LCN"), rather he allegedly is an "associate."  Ex. 1 at ¶ 8.  "Associates" are individuals "who, although not formally members of the LCN, perform necessary and helpful roles in the Family's criminal activities."  Id.  The government submitted a transcript of a conversation between CW-1 and D'Amore on September 27, 2006 in which D'Amore confirmed that he had "a few friends" in the LCN, stated that if he was not on parole he "really could move around and make a lot of money for everybody," and expressed support (and a willingness to contribute $50,000.00) to LCN members who were completing long criminal sentences and were soon to be released.  Ex. 3.

### C.  Evaluation of Factors

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  United States v. Salerno, 481 U.S. 739, 755, 107 S. Ct. 2095, 2105, 95 L. Ed. 2d 697 (1987).  After a careful review of the evidence, this court concludes that the government has not met its burden of proving by clear and convincing evidence either that there are no conditions which can be set which will reasonably assure the safety of witnesses or the community or that there is a serious risk that the defendant will obstruct or attempt to obstruct justice as defined by § 3142(f)(2)(B).  The government has also not established by a preponderance of the

evidence that the defendant is likely to flee.  Therefore, the defendant will be ordered released on the conditions set forth below.

### Risk of Danger

The evidence before this court is that this defendant had minimal involvement in an alleged scheme to bribe a highway official.  Thus, the evidence is that at the direction of the co-defendant DiNunzio, D'Amore arranged for the involvement of Marino to supply the loam to be sold to the Big Dig.  D'Amore does not appear to have had any significant role in planning the alleged scheme.

Similarly, the evidence before this court is that D'Amore does not have any significant role in LCN.  Rather, he has been an "associate" who has helped out members of the Family.  Thus, if conditions are set which isolate D'Amore from his co-defendants and other members of LCN, this court will be reasonably assured that the defendant will not continue to engage in illegal activities.

This defendant does not have a history of violence, and there is nothing in the case presented to this court which indicates that the defendant intended to engage in any violence.  Nor is there any evidence that he threatened any participant in the alleged scheme, or anyone else.  There is nothing in D'Amore's history or the evidence of the instant case which indicates that he would obstruct the prosecution of this action in any way.  The risk of danger to the community in D'Amore's case is the risk that he will continue to engage in criminal activities.

The fact that the defendant allegedly engaged in this scheme while on super-vised release is evidence of a failure to abide by directions of the court.  This is

troubling given the fact that the defendant had recently completed a lengthy prison

term.  Again, however, his involvement in the case before this court appears to have

been fairly limited, and to have been done at the behest of DiNunzio.

The defendant did comply with all of his reporting obligations while on five years

of supervised release.  Moreover, the recorded conversation introduced by the

government indicates that the defendant felt compelled to comply with the restrictions

on his travel imposed as a condition of his supervised release.  While he may have

bemoaned the fact that such restrictions impinged on his ability to "move around and

make a lot of money for everybody" (Ex. 4), he nevertheless felt compelled to comply

with the condition.  Therefore, this court concludes that there are conditions of release

which can be fashioned which will reasonably assure the safety of the community and

of the witnesses.

## Risk of Flight

The government does not seriously argue that the defendant is likely to flee, and

this court finds that the government has not met its burden of proof on this issue.  Other

than the length of the potential sentence in this case, there are no factors indicating

that the defendant is not likely to appear.  While the defendant has a passport, it can

be turned over to Pretrial Services for safekeeping.  His international travel appears to

be limited.  There is no evidence before the court that the defendant has significant

contacts elsewhere where he would be likely to flee.

## Conditions of Release

The government also has not met its burden of proving that there are no conditions or combinations of conditions which would reasonably assure the safety of witnesses and the community, or the defendant's appearance as required.  The defendant does not have significant assets, and has proposed posting a $25,000 unsecured bond.  This amount is sufficient to cause the defendant to pause before violating any conditions.

The defendant has also agreed to maintain his current residence, and to go on electronic monitoring 24/7 if ordered by the court.  This would eliminate any risk of flight and would, in this court's view, reasonably eliminate any concerns that the defendant would continue to engage in illegal activities.  The types of crimes with which the defendant has been engaged in the past required his personal involvement and could not be conducted from his home.  The defendant has sufficient family around to assist him while detained at his home.

The defendant will be allowed to attend pre-approved medical and legal appointments.  However, the defendant's activities outside the home should be monitored.  For present, the court will order that the defendant be escorted by counsel.  However, the court will entertain a proposal for another person to monitor and escort the defendant.

The other conditions, as detailed below, are designed to insure that the defendant will not continue to engage in illegal activities while on release.

## IV.  <u>CONDITIONS OF RELEASE</u>

IT IS ACCORDINGLY ORDERED that the defendant be released on the following conditions:

-14-

(1)    The defendant shall post a $25,000 unsecured bond.  This bond is to secure compliance with <u>all</u> conditions of pre-trial release.

(2)    The defendant shall maintain his current residence (hereinafter the "Custodial Residence").

(3)    The defendant shall be placed on electronic monitoring at the Custodial Residence.  Defendant may not travel except for court appearances, to meet with his attorney, to report to Pretrial Services, or to receive medical attention.  Travel is restricted to the Commonwealth of Massachusetts.  Each such trip must be previously approved by Pretrial Services and the defendant must be escorted to such appointments by counsel or another individual approved by the court.  In a medical emergency, the defendant is to contact Pretrial Services as soon as practicable by telephone and may be transported in such an emergency to the hospital.

(4)    Defendant shall avoid all contact, whether direct or indirect, in person, through another person, by telephone, e-mail or by any other means of communication, with the undercover officer and confidential witness in this case.

(5)    Defendant shall avoid all contact, whether direct or indirect, in person, through another person, by telephone, e-mail or by any other means of communication, with any other potential witness in this case, including all named defendants, unless defendant's attorney of record is physically present.  Also, defendant shall have no direct or indirect contact of any sort with persons whose names appear upon an "Association List" to be prepared by the U.S. Attorney's Office and served upon defendant counsel.  If defendant seeks contact with any person on the "Association

List," he shall, through his attorney, first seek approval from the United States Attorney and, in the absence of approval, defendant may apply to this court upon a showing of good cause.

(6)    Furthermore, the defendant shall:

    (a)    report to Pretrial Services as directed;

    (b)    refrain from possessing a firearm, destructive device or other dangerous device, and any such device must be removed from the Custodial Residence;

    (c)    surrender any passports and may not apply for any passports or travel documents while this matter is pending;

    (d)    agree to random drug testing as required by Pretrial Services; and

    (e)    commit no federal, state or local crime during the period of release.

(7)    Statutory conditions of release shall apply as well.

           / s / Judith Gail Dein
           Judith Gail Dein
           United States Magistrate Judge